Case 1:26-cv-02629-CHK  Document 1  Filed 05/01/26  Page 1 of 57 PageID #: 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

CYNTHIA SQUIRE, on behalf of
herself and all others similarly
situated,

      *Plaintiff,*

v.

JETBLUE AIRWAYS
CORPORATION,

      *Defendant.*

———————————————————— x

**CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

Plaintiff CYNTHIA SQUIRE ("Plaintiff") brings this class action complaint (the "Action") on behalf of herself and others similarly situated for violations of federal and state law against Defendant, JETBLUE AIRWAYS CORPORATION ("JetBlue" or the "Defendant") upon personal knowledge as to herself and her own actions, information and belief, and the investigation of her counsel, seeking actual damages, statutory damages, pre- and post-judgment interest, reasonable costs and attorneys' fees, a declaratory judgment, injunctive relief, and any other relief this Court deems just and proper, as follows:

## **INTRODUCTION**

1. This is one of the very first class action lawsuits in American history regarding dynamic surveillance pricing and the surreptitious use of consumer data in order to set pricing based on consumer behavior.

2. Plaintiff and the members of the proposed Class are airline travelers who have used JetBlue's website, *www.jetblue.com*, within the relevant statutory period to book airline travel and acquire airline tickets on JetBlue's airline as well as the airlines that codeshare with JetBlue.

3. JetBlue offers services related to airline travel.

1

4.     The data associated with air travel is highly sensitive because it involves the collection of personally identifiable information as well as the specific transaction data related to Plaintiff's air travel.

5.     For example, if a user of JetBlue's website is seeking airline tickets for travel purposes the website must combine identifiers (*e.g.*, the travelers' name, connected accounts, including their email address, and their internet protocol address) together with other information, including the data needed to book airfare (*e.g.*, government identification, full name, address and other information), as well as information about the airfare itself (travel information) and payment information.[1]

6.     Consumers' digital booking of JetBlue's airfare services comes with a reasonable expectation of privacy because of the sensitive nature of the PII provided, and thus JetBlue's website users have the very same privacy rights as those who physically walk up to an airline ticketing counter.  With that in mind, ordinarily, a traveler would have to consent to the presence of other third-parties looking over their

---

[1] Taken together with personally identifiable information, such as a customer identifier, internet protocol address, or other information that identifies a specific person, the "PII."

shoulders or being at an airline ticketing counter along with them as they transact business with and provide PII to an airline, as is the case here.

7.      However, rather than protect consumers' PII, JetBlue uses tracking technology and otherwise allows third parties to collect, retain, and use traveler data without adequate and sufficient consent from Plaintiff and members of the proposed Class using tracking technology embedded in website code.  The existence of the trackers used by JetBlue and by third parties on the website is a breach of travelers' privacy.

8.      This is especially so considering that the methodology and purpose for deploying these technologies are not adequately disclosed: while JetBlue has a Privacy Policy, it: (1) does not disclose that the trackers are used to set pricing (*e.g.*, when a consumer searches for airline tickets and then closes the browser window, JetBlue increases the prices when the consumer seeks to re-engage JetBlue to purchase a ticket), (2) JetBlue does not disclose that the trackers are used for behavioral analytics that also allow the airline to set pricing dynamically, as opposed to set static pricing, and (3) it generally does

3

not disclose that JetBlue shares consumer data with third parties for the purpose of setting prices.

9.    However, JetBlue *does* share consumer data with numerous third parties. In fact, JetBlue admitted on social media that it uses this form of dynamic surveillance pricing, as can be seen below on April 18, 2026:



10.    Sharing information with third parties and allowing them to secretly collect this information makes this possible.  Several different third-party entities collect data from JetBlue's booking pages, and JetBlue shares data with other entities.

11.    With respect to such third-parties, two examples are behavioral analytics firms that collect data using tracking technology

4

from JetBlue's website in the background called Dynamic Yield by Mastercard ("Dynamic Yield") and FullStory, Inc. ("FullStory"). Each of these tracking entities intercepts data from JetBlue's website, and their behavior includes making behavioral assessments of users, as well as creating price differentials based on the data collected.

12.    Naturally, JetBlue deleted its social media post and denied that dynamic surveillance pricing takes place. But JetBlue's website code, other public statements, and this admission on social media all show otherwise. And while setting higher prices based on consumer behavior is abhorrent, this Action is focused on the consumer privacy violations of travelers who book flights on JetBlue's website. Consumers should not have to have their privacy rights violated to participate in JetBlue's digital rat race for airline tickets that should cost the same for each similarly seated passenger.

13.    Dynamic surveillance pricing, and, specifically, JetBlue's recent conduct, has drawn consternation from Congress and federal regulatory authorities. In fact, both Mastercard (which owns Dynamic Yield) and PROS have been the target of investigatory letters from the

5

Federal Trade Commission regarding their application of surveillance pricing to consumer marketplaces.

14. As described herein, JetBlue has blatantly invaded or allowed for the invasion of Plaintiff and Class members' privacy rights. Plaintiff seeks to rectify these harms under federal, state, and common law causes of action, pursuing actual damages, statutory damages, pre- and post-judgment interest, reasonable costs and attorneys' fees, a declaratory judgment, injunctive relief, and any other relief this Court deems just and proper.

## JURISDICTION AND VENUE

15. *Subject Matter Jurisdiction.* This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff brings a claim under a federal statute, as well as pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). As required by CAFA, the amount in controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are well over 100 putative Class members, and minimal diversity exists, because one or more putative Class members are citizens of a different state than Defendant. Namely, numerous members of the putative Class are

domiciled in states around the country other than New York, including Plaintiff Squire.

16.    Additionally, this Court has supplemental jurisdiction over Plaintiff's state law claims, under 28 U.S.C. § 1367(a), as Plaintiff's state law claims are so related to Plaintiff's Electronic Communications Privacy Act claims such that they form part of the same case or controversy.

17.    *Personal Jurisdiction.*  This Court has personal jurisdiction over JetBlue because JetBlue is headquartered in New York, JetBlue is registered to do business in New York, JetBlue's acts or practices were directed toward this State and towards Class members in this State (and thus, Defendant intentionally availed itself of this jurisdiction by choosing to do business in New York and direct its business towards Class members), and, since JetBlue's website is used throughout the United States, Defendant knew or should have known that tracking technologies were being used to intercept the actions of Class members in New York.

18.    *Venue.*  Venue is proper under 28 U.S.C. § 1391, because Defendant is headquartered in, resides in, and conducts business in this

7

District, (2) Defendant's acts or omissions were directed toward this District, (3) a substantial part of the events, acts and omissions giving rise to Plaintiff's and the Class members' claims occurred in this District, and (4) because many of the Class members were harmed here.

## PARTIES

### PLAINTIFF

*Plaintiff Cynthia Squire*

19.    Plaintiff Squire is domiciled in the Commonwealth of Virgina.

20.    During the relevant period, in or about December of 2025, Plaintiff Squire visited JetBlue's website to book a flight on its website, in particular a roundtrip flight for herself and her minor son from Virginia to Puerto Rico. During the booking process, Plaintiff Squire provided, *inter alia,* her departure and arrival locations and the personally identifiable information required to book a flight (*e.g.,* her name, address, gender, etc.), the same information for her son, and her payment information. Additionally, JetBlue's tracking code collected other information, including whether or not Plaintiff Squire closed the website, a Google identifier, and other data that is detailed below.

21.    During the process of booking this flight, after entering the information detailed in the previous paragraph, she called Defendant's customer service hotline to receive assistance with entering a flight credit code that she had received in connection with a previous flight she took with Defendant. Once the customer service agent was able to assist her, the website refreshed and the cost of the flight more than doubled. Eventually, with this incredible increase in price, she decided only to book the return leg of the trip, the leg for which the price only moderately increased, and waited to purchase the departing trip, in hopes that prices would fall. After some time passed, and as prices continued to rise, she purchased the departing trip at over four times the original price.

22.    While on JetBlue's website, Plaintiff Squire was entirely unaware that she was being tracked for the purpose of setting pricing.

23.    Not only was Plaintiff Squire not adequately informed about the sale of her data to these third parties, but she was not adequately given compensation for her sensitive and valuable information.

24.    Plaintiff Squire has suffered the following injuries from (1) the interception of her private and valuable data, (2) the disclosure of her private and valuable data to unauthorized third parties, and (3) the

9

failure to justly compensate Plaintiff Squire for her valuable information:

    a.  The loss of value of personally identifiable information and/or travel data that might be associated with Plaintiff Squire's visits to JetBlue's website;

    b.  Intrusion upon Plaintiff Squire's and Class members' privacy on JetBlue's website where it was reasonable for Plaintiff Squire and Class members to have an expectation of privacy;

    c.  Lack of compensation for the sale of Plaintiff Squire's and Class members' data; and

    d.  Profiting from the collection, retention, use and/or sale of Plaintiff Squire's and Class members' data in a way that would be inequitable sans disgorgement of profit.

25. Indeed, Plaintiff Squire's personal data collected by JetBlue has real, tangible value: (1) it can be used to dynamically adjust flight pricing, (2) it is repackaged and given to other third parties for use through Dynamic Yield (as explained below), and (3) it allows JetBlue to serve advertisements on its own websites.

26. Had Plaintiff Squire known about the surreptitious collection and tracking of her PII, she would have used a different airline or booked travel a third-party travel website.

## DEFENDANT

### *Defendant JetBlue Airways Corporation*

27. Defendant JetBlue Airways Corporation is a corporation with its principal place of business located in Long Island City, New York.

28. Defendant is a sophisticated business that provides airline tickets and other airfare to millions of Americans on an annual basis. Indeed, it is one of the largest airlines in the United States.

29. In the course of doing business, Defendant maintains a website at the following URL address: *www.jetblue.com*. This website is used by travelers seeking airline tickets, like Plaintiff and Class members.

## <u>FACTUAL ALLEGATIONS</u>

### *JetBlue's Business and Data Collection*

30. JetBlue is an American low-cost airline that is headquartered in Queens, New York City. Defendant's primary hub is John F. Kennedy International Airport, from which JetBlue's customers

fly to destinations across the United States. Currently, JetBlue has over 279 planes in its fleet and travels to 111 destinations.

31. JetBlue provides flights to airline fliers by assisting with the process of booking, both through its website and on third party websites. In order to do this, the customers who use the Defendant's website provide Defendant with significant data to find the right flight(s).

32. By its very nature, JetBlue – a business that is frequented by Plaintiff and Class members – is the type of business that requires heightened levels of privacy. The collection of data is highly sensitive, which is why JetBlue promises discretion both in the way it conducts its business and the data it collects through its website (and through other means), including in its "privacy choices" page that states that "[o]ur privacy commitments are fundamental to the way we run our business" and that "JetBlue may share information that does not identify you (including information that has been aggregated or de-identified)." This can be seen below:

12



jetBlue   Book ⌄   My Trips ⌄   Travel Info ⌄   TrueBlue ⌄                        Sign in

Notwithstanding the above, we may share information that does not identify you (including information that has been aggregated or de-identified) except as prohibited by applicable law. All the above categories exclude text messaging originator opt-in data and consent which will not be shared with any third parties. For information on your rights and choices regarding how we share information about you, please see the "Your Rights and Choices" section below.

33.    Additionally, the banner pop-up that Defendant uses does not disclose that JetBlue uses data collection for the purpose of surveillance pricing:

We use cookies to enhance user experience, analyze website traffic and offer personalized advertising, per our Privacy Policy.

**Manage**                    **Accept**

34.    No reasonable consumer would presume that this banner pop-up would include the collection and use of their data through cookies to set pricing, let alone to share it with third parties to do so.

13

35.    Furthermore, JetBlue initially seems to understand the critical nature of protecting passenger data; but immediately contradicts itself by stating that aspects of the website do not work unless users opt into the data sharing.  Even so, if consumers opt into JetBlue's data sharing, the Privacy Policy does not disclose that their information is being used to set prices.  In fact, these are the only purposes for data collection, retention, and use that JetBlue discloses with respect to its Privacy Policy:

   a. Use by Service Providers (payment processing, travel and booking reservation, identity verification, data analytics, marketing and advertising, website hosting, and technical support);

   b. Vendors and Other Parties (advertising and analytics);

   c. Affiliates (customer support, marketing, booking, advertising and technical operations);

   d. Partners (for services and distribution of products or joint ventures);

   e. Promotions;

   f. Public Forums;

g. Merger and Acquisition;

h. Security or Compelled Disclosure (to law enforcement and other authorities);

i. Facilitating Requests (via social media); and

j. Consent.

36.    There are no disclosures of the use of consumer data for the purpose of dynamic surveillance pricing.  And the data that the Privacy Policy purports to collect is vast:

a. Contact Data (first and last name, email address, postal address, telephone number);

b. Billing Information;

c. Demographic Data (age, gender, and country of origin);

d. Profile Data (interests, inferences, preferences, and favorites);

e. Content (posted on forums or on JetBlue's blogs);

f. Personal Contacts and Passenger Data;

g. Job Applicant Data (if applicable);

37.    Finally, JetBlue lists the types of data collected through tracking technology (while not disclosing that the end use is for dynamic surveillance pricing):

a.  Internet Protocol address;

b.  Device Identifier;

c.  Browser Type and Version;

d.  Operating System and Platform;

e.  Mobile Device Type;

f.  Wireless Carrier;

g.  Data Regarding Network Connected Hardware;

h.  The Time Spent Engaging With JetBlue's Services;

i.  Page Views;

j.  Information Searched For;

k.  Geo-Location Data;

l.  Pages Visited;

m. Content and Advertisements Viewed;

n.  Products and Services Viewed;

o.  Purchases and Purchase History;

p.  Time of Day When Browsing;

q. Referring Pages; and,

r. Exiting Pages.

38. Defendant makes privacy assurances and representations that directly contradict the reason and rationale for the types of data that they collect. Privacy-based representations are material components of the services that JetBlue has to offer through its website: JetBlue knows that otherwise those representations (which, as discussed below, are false) and the manner in which those representations are made are done so to drive goodwill, website traffic, and consumer trust to JetBlue.

39. JetBlue can also make significant assumptions based on the data it collects that impact pricing. For example, historically, the "Operating System and Platform" a consumer uses may seem benign, but it is commonly weaponized as a means to tell the socioeconomic status of a consumer, as those who use Apple's iOS operating system and platforms are often wealthier than those who use an Android operating system and platform. Additionally, JetBlue collects information about the geographic location (geo-location) of consumers, which allows

17

JetBlue to adjust prices based on a person's zip code or the socioeconomic class of where they live or are located.

40. This is all highly concerning. It allows JetBlue to manipulate prices in real time in order to make as much money as they can on fares for airline tickets that are priced differently for consumers based on their private information that they did not consent to surrender for this purpose.

### JetBlue's Surveillance Pricing

41. Rather than keep this private information (the information collected as well as the datapoint itself that a particular consumer had visited the JetBlue website at all) protected, JetBlue instead opted to make it available for collection, weaponize it for pricing purposes, and share it with other third parties like FullStory and PROS.

42. JetBlue either knew (and was likely profiting from) or should have known that third parties were using its website to collect data. It defies logic to believe that FullStory and PROS would merely collect, retain, and otherwise use JetBlue's data for free. These third parties used tracking technologies to collect data on Plaintiff and Class members, then used those technologies to analyze consumer behavior

and ultimately change prices, including Dynamic Yield, FullStory, and PROS.

43.    ***Dynamic Yield.***  Dynamic Yield is a digital AI platform that has tracking technology on JetBlue's booking website (as discussed below) and lists JetBlue as one of its clients.[2]  According to SAP, "Dynamic Yield is an AI-powered personalization and optimization platform that helps leading brands create personal digital experiences that drive engagement, conversions and revenue."[3]  Essentially, Dynamic Yield collects consumers' data and then uses AI to tailor consumers' purchasing experiences on websites – including JetBlue's.

44.    An image of the code of the Dynamic Yield tracking technology placed on JetBlue's website appears as follows:

---

[2] https://www.dynamicyield.com/clients/, (last accessed, Apr. 24, 2026).

[3] https://www.dynamicyield.com/case-studies/hrs/, (last accessed Apr. 24, 2026).

19

https://st.dynamicyield.com/st?sec=87911
40&ref=https%3A%2F%2Fwww.jetblue.co
m%2F&scriptVersion=2.84.0&inHead=true
&id=0&jsession=fwf9jt9b1b4irvlfiurpg20d
065rxonn&isSesNew=true&dyid_server=0
&ctx=%7B%22type%22%3A%22PRODUC
T%22%2C%22data%22%3A%5B%22NYC-
JAX%22%5D%7D&noConsent=true

45.    Among the public-facing successes Dynamic Yield lists on its website, Dynamic Yield hails its work for travel companies and "boost[s] revenue per user for specific target audiences by 2.5% by displaying recently viewed accommodations on the homepage for returning visitors."[4] Put differently, Dynamic Yield's trackers – which JetBlue deploys on its website – track when users return to the website (amongst other behaviors) in order to modify JetBlue's website upon their return.

46.    According to Dynamic Yield, it allows retailers to use deep learning and reinforcement learning to "gain deeper user demographics, preferences, and real-time behavior that allows you to tailor every [] experience like magic."[5]  Dynamic Yield also states that retailers can

---

[4] https://www.dynamicyield.com/case-studies/hrs/, (last accessed Apr. 24, 2026).
[5] https://www.dynamicyield.com/recommendations/, (last accessed Apr. 24, 2026).

20

"dynamically adjust recommendations across product and content to reflect a customer's preferences, affinities, and behavior in real-time."[6]

47.   The way that Dynamic Yield works is through tracking technology that collects datapoints that then targets certain users for different types of purchasing characteristics.  According to an article written by Dynamic Yield, it uses targeting based on data involving: time of day, affinity (users who express high interest), new user/first session targeting (targeting users who are in their first session), session behavior (based on page views and behaviors taken on the website), shared-audience behavior (linking behavior from another retailer that uses Dynamic Yield tracking to the current website's use of the tracking), traffic source (targeting based off of origin of traffic, like from social media, etc.), technology use (the type of device, browser, operation system, operating brand, screen resolution, and user agent), location (targeting based on geographic location), weather forecasts (predictive weather forecasts that might impact behavior in purchasing), and other

---

[6] https://www.dynamicyield.com/recommendations/, (last accessed Apr. 24, 2026).

types of data.[7]  Much of this can be seen in the code that Dynamic Yield deploys on JetBlue's website.

48.    For example, as the backend code of the website reveals, Dynamic Yield's trackers know when a user has engaged in a previous session, who the user is, and then performs an analysis of behavior of users (called an 'empathy segment' or 'empathy type') to assess the type of purchaser, as can be seen below:



49.    In the above assessment, Dynamic Yield makes assumptions that the person on JetBlue's website is "confident," "satisfied," "focused" and even "in love" – these are all behavioral determinations that drive

---

[7] https://www.dynamicyield.com/blog/essential-recommendation-capabilities/, (last accessed Apr. 24, 2026).

consumer behavior, including price elasticity. Dynamic Yield's code also includes brackets of what prices could be adjusted to in the same analysis that the code calls a "price differential":

[{"condType":"PageVisited","subType":null,"conds":[{"id":13106301,"parameter":null,"selectMethod":"contains","selectParameter":"utm_campaign=jba_mh_meta_sale_retail-conversion-comfortvalue","selectParameter2":null,"hitCountMethod":">=","hitCount":1,"includeUrlParams":1}]}]},{"audience":2990741,"updatedAt":"2026-02-03 22:52:54","session":0,"sticky":0,"hidden":0,"conditionDays":30,"validDays":1,"audienceType":"user_attributes","name":"Price Differential: $0-50","rule":[{"condType":"SiteEvent","subType":null,"conds":[{"id":13107161,"parameter":73606598,"selectMethod":"equals","selectParameter":"$0-50 - Price Differential","selectParameter2":null,"hitCountMethod":">=","hitCount":1,"includeUrlParams":0}]}]},{"audience":2990742,"updatedAt":"2026-02-03 22:53:15","session":0,"sticky":0,"hidden":0,"conditionDays":30,"validDays":1,"audienceType":"user_attributes","name":"Price Differential: $50-100","rule":[{"condType":"SiteEvent","subType":null,"conds":[{"id":13107167,"parameter":73606600,"selectMethod":"equals","selectParameter":"$50-100 - Price Differential","selectParameter2":null,"hitCountMethod":">=","hitCount":1,"includeUrlParams":0}]}]},{"audience":2990744,"updatedAt":"2026-02-03 22:54:09","session":0,"sticky":0,"hidden":0,"conditionDays":30,"validDays":1,"audienceType":"user_attributes","name":"Price Differential: $100+","rule":[{"condType":"SiteEvent","subType":null,"conds":[{"id":13107169,"parameter":73606599,"selectMethod":"equals","selectParameter":"+$100 - Price Differential","selectParameter2":null,"hitCountMethod":">=","hitCount":1,"includeUrlParams":0}]}]},{"audience":2996346,"updatedAt":"2026-02-13 04:12:35","session":0,"sticky":0,"hidden":0,"conditionDays":7,"validDays":1,"audienceType":"user_attributes","name":"SJU (JBV)","rule":

:1}]}]},{"audience":2990741,"updatedAt":"2026-02-03
":"user_attributes","name":"Price Differential: $0-50","rule":
ctMethod":"equals","selectParameter":"$0-50 - Price
":0}]}]},{"audience":2990742,"updatedAt":"2026-02-03
":"user_attributes","name":"Price Differential: $50-100","rule":
ctMethod":"equals","selectParameter":"$50-100 - Price
":0}]}]},{"audience":2990744,"updatedAt":"2026-02-03
":"user_attributes","name":"Price Differential: $100+","rule":
ctMethod":"equals","selectParameter":"+$100 - Price
":0}]}]},{"audience":2996346,"updatedAt":"2026-02-13
":"user_attributes","name":"SJU (JBV)","rule":

50. The code also makes assumptions using the data it collects to determine whether the user is an "Above Average Fare Purchaser" which can be seen in the screenshot below:

{"audience":2687472,"updatedAt":"2025-03-26 18:31:05","session":0,"sticky":0,"hidden":0,"conditionDays":90,"validDays":1,"audienceType":"user_attributes","name":"Below Average Fare Purchaser","rule":[{"condType":"TrackedValue","subType":null,"conds":
[{"id":10829314,"parameter":null,"selectMethod":"equals","selectParameter":"PURCHASE","selectParameter2":null,"hitCountMethod":"<","hitCount":20700,"includeUrlParams":0}]}]},
{"audience":2687473,"updatedAt":"2025-03-26 18:30:59","session":0,"sticky":0,"hidden":0,"conditionDays":90,"validDays":1,"audienceType":"user_attributes","name":"Above Average Fare Purchaser","rule":[{"condType":"TrackedValue","subType":null,"conds":

:"user_attributes","name":"Below Average Fare

Count":20700,"includeUrlParams":0}]}]},
:"user_attributes","name":"Above Average Fare

23

51.    Part of this analysis, which can be seen in the code, also includes the user's personally assigned identifier ("id":13107167), whether the user has engaged in a previous session ("session":0), the user's attributes ("user_attributes") and other factors.

52.    Dynamic Yield allows for customized implementation of rules that use the collected data to make determinations.  As Dynamic Yield states, retainers can "[a]dd real-time filter rules to filter the results based on data obtained within the session (*e.g.* show products priced higher than the currently viewed product, present products based on the visitor's explicit selection, etc.).[8]  Dynamic Yield can also ensure that only a certain subset of products will be included (whitelisted) or not included (blacklisted) based off the data collected.[9]  All of this means that, contrary to JetBlue's public representations, it deploys technology on its website that intercepts users' data, does not disclose the purpose for its collection, then can either adjust prices based off of consumer

---

[8] https://www.dynamicyield.com/blog/essential-recommendation-capabilities/, (last accessed Apr. 24, 2026).

[9] https://www.dynamicyield.com/blog/essential-recommendation-capabilities/, (last accessed Apr. 24, 2026).

behavior predicated on collected data or hide/reveal certain products based on that consumer's behavior.

53. The use of personalized code for each user is not something that Dynamic Yield keeps confidentially – in fact, they openly advertise it as part of their e-Commerce service. For example, Dynamic Yield states that, for one e-Commerce customer, "[s]erving personalized recommendations powered by deep learning algorithms leads to 88% increase in average revenue per user."[10] The case study of that particular customer discussed how "Dynamic Yield's deep learning recommendations could not only mine the past behavior of users, but also their in-session activity."[11]

54. Another key customer of Dynamic Yield is the ubiquitous McDonalds.[12] McDonalds uses Dynamic Yield's algorithm to optimize sales to consumers based on various factors, including the time of day and the traffic at a specific restaurant where orders are placed.[13]

---

[10] https://www.dynamicyield.com/ecommerce/, (last accessed Apr. 24, 2026).

[11] https://www.dynamicyield.com/files/case-studies/glasses-usa-dy-case-study.pdf, (last accessed Apr. 24, 2026).

[12] https://www.dynamicyield.com/case-studies/mcdonalds/, (last accessed Apr. 24, 2026).

[13] *Id.*

McDonalds hails Dynamic Yield's algorithm as a success because it generates higher average check sizes.[14] While McDonalds uses Dynamic Yield's product in-store and at the drive through window kiosk, the model remains the same: collect data and use it to find ways to generate higher revenues which ordinarily would not be actualized.

55. ***FullStory.*** FullStory is a behavioral analytics and data collection platform which provides Fullstory's "behavior data platform to optimize its digital experience [b]y closely monitoring revenue-impacting features and enhancing user flows" services using data collection, behavioral analysis, and user targeting, uses trackers to collect data on numerous pages on Defendant's website.[15]

56. The appearance of FullStory's tracking code on JetBlue's website appears as follows ("^3p" is a third-party request on a first party website):

---

[14] *Id.*

[15] https://www.fullstory.com/customer-story/travel-hospitality/jetblue/?utm_source=google&utm_medium=paid-search&utm_campaign=GS-2024-Demo-Brand&utm_offer=demo&utm_product=AN&utm_term=fullstory&gad_source=1&gad_campaignid=21245150379&gbraid=0AAAAADmJjBSlgmSQDc1P7B5VkyxmrcdkT&gclid=EAIaIQobChMIy7_Fnv2BlAMV-WlHAR0BTSzbEAAYASAAEgK9R_D_BwE, (last accessed Apr. 22, 2026).



57.    According to JetBlue's Digital Experience Product Manager, Greg Kaplan, "[w]ith FullStory, we can make product decisions faster. If an issue crops up, I can see how big its impact is within two minutes and determine how we should prioritize it.  With other tools, there can be a significant lead time between when the data is logged and when it's indexed and available – it's been so valuable to have the data at our fingertips immediately."[16]

58.    **PROS.**  Additionally, JetBlue shares consumer data with a company called PROS Holdings, Inc., which uses an algorithm to set pricing in real time based on "buyer behavior" as discussed more below.

59.    JetBlue uses dynamic pricing powered by its own data since 2024.[17]  Apparently, airlines have used dynamic pricing for decades –

---

[16] *Id.*

[17] https://www.timeout.com/usa/news/jetblue-increased-its-bag-fees-as-oil-prices-rise-033126, (last accessed April 22, 2026).

including products like those created by PROS – which JetBlue currently uses. In fact, when JetBlue began to use PROS revenue management dynamic pricing system, PROS touted its use as a "customer success story." At the time, on June 13, 2025, PROS stated, "JetBlue set out to solve a persistent challenge: forecast accuracy. With previous revenue management systems falling short, the team was forced to rely heavily on manual overrides – hindering efficiency and trust in the data."

60. The job of PROS is to set prices through algorithms, and algorithms do this through the collection of data. According to the Financial Times in 2017, "PROS says its algorithms set more prices each day than Twitter sends tweets."

61. Today, PROS uses real-time dynamic pricing that sets pricing at the time of the transaction to maximize revenue – the only way that PROS would be able to set said pricing is to have the data points to do it: which come from consumers. As PROS explains, its real-time dynamic pricing "enables airlines to offer prices to their customers based on contextual information available at the time of shopping." PROS has a model of this on its website:



## Continuous Pricing

PROS Real-Time Dynamic Pricing supports AI-driven continuous pricing, helping airlines offer fares between predefined price levels instead of relying on rigid class-based pricing. This scientific approach uses real-time data and advanced algorithms to adjust fares dynamically, capturing hidden demand and increasing revenue with more precise, market-responsive pricing.

62. Additionally, PROS's 2024 annual report states that its software adapts based on the particular customer, "[o]ur AI-powered algorithms provide market relevant price guidance, dynamically refining prices in response to changing market conditions and buyer behavior. This predictive and prescriptive price guidance tailors pricing for each unique buying scenario."

63. In fact, in July of 2024, Mastercard (which owns Dynamic Yield) and PROS were both sent letters by the Federal Trade

29

Commission about their use of surveillance pricing.[18] [19]  The FTC then issued a Request for Public Comments Regarding Surveillance Pricing Practices, at FTC Docket ID 2025-0007.[20]  More than 25% of the comments in public submission on the docket directly complained of surveillance pricing by airlines.  One comment in public submission by an anonymous citizen stated, "[a]irline ticket price searching" is the "most apparent" form of surveillance pricing – leading to the "worse experience for finding affordable tickets."[21]

64.   Again, none of this would have been possible had JetBlue not been collecting this data in the first instance, let alone shared it with third parties like FullStory, PROS and others.

65.   JetBlue also allows for the presence of Google Tag Pixels, that individually identify consumers, contrary to the privacy policy's promise to otherwise not do so; indeed "GTM-5J92P6SM" is a Google identifier that is assigned to an individual user.

[18] https://tedmag.com/ftc-orders-pros-7-others-to-provide-surveillance-pricing-information/, (last accessed Apr. 24, 2026).

[19] https://www.ftc.gov/news-events/news/press-releases/2024/07/ftc-issues-orders-eight-companies-seeking-information-surveillance-pricing, (last accessed Apr. 24, 2026).

[20] https://www.regulations.gov/docket/FTC-2025-0007, (last accessed Apr. 24, 2026).
[21] https://www.regulations.gov/comment/FTC-2025-0007-0030, (last accessed Apr. 24, 2026).

30



66.    JetBlue uses tracking mechanisms through cookies that can be used to set pricing.  For example, JetBlue collects a substantial amount of consumer data using tracking technologies when booking flights:

https://www.jetblue.com/booking/flights?adults=1&children=0&infants=0&from=NYC&to=JAX&return=2026-04-28&depart=2026-04-23&isMultiCity=false&noOfRoute=1&roundTripFaresFlag=false&sharedMarket=false&usePoints=false

https://sdk.asapp.com/chat-sdk-iframe.html?APIHostname=jetblue.asapp.com&CompanyMarker=jetblue&Origin=https%3A%2F%2Fwww.jetblue.com%2Fbooking%2Fflights&RegionCode=US&Language=en

https://www.jetblue.com/booking/flights?adults=1&children=0&infants=0&from=NYC&to=JAX&return=2026-04-28&depart=2026-04-23&isMultiCity=false&noOfRoute=1&roundTripFaresFlag=false&sharedMarket=false&usePoints=false

67.    As seen in the code, it collects the passenger type (adults, children or infants), the departure and destination data, the proposed dates of travel, whether or not the fares should be flagged as round trip (which  presumably  impacts  the  price)  the  booking  origin  (JetBlue's

31

website), the region of booking (United States), and the language used to book the flight (English).  Each of these are data points that do not need to be collected through surreptitious tracking technology, especially given that a consumer would willingly give them over to the JetBlue.  The reason for this is because this data is necessary to feed into algorithms from JetBlue directly to third parties.

68.    This sensitive information and identifying data is highly valuable, and because a variety of different end-users could have utilization for it, it maintains its value as it is collected, sold, and resold. JetBlue allows for the collection of this data at its primary source: directly from Plaintiff and Class members themselves.

69.    The reason that Defendant collects this data is because it has an even higher value than ordinary data – it allows tangible increases in pricing for airline tickets, which JetBlue has publicly acknowledged.

### *The Harms of Surveillance Pricing*

70.  Surveillance pricing is the use of personal data, like "browsing history, spending habits, location, or even signals about […] income to figure out what you're likely willing to pay and then adjust

32

accordingly."[22]   While surveillance pricing is not illegal in the United States, secretly collecting consumer data on the internet without adequate consent is - and that is the basis for this Action.

71.    According to Lindsay Owens, a privacy expert who leads the Groundwork Collaborative think-tank: "JetBlue accidentally tweeted their cold-blooded confession that they are using consumers' search history against them to drive up prices."[23]

72.    According to Grace Gedye, senior policy analyst at Consumer Reports: "We are seeing more evidence of these types of pricing practices and call on lawmakers to introduce new rules that would require transparency in pricing practices and prohibit surveillance pricing."[24]

73.    Naturally, JetBlue denied this practice, stating that the admission was "incorrect and we apologize for the error."  It also added "JetBlue fares on JetBlue.com and our mobile app[lication] are not determined by cached data or any other personal information.  We do

---

[22] https://www.travelpirates.com/captains-log/jetblue-surveillance-pricing-explained, (last accessed Apr. 22, 2026).

[23] *Id.*

[24] *Id.*

not use AI or personal data to set individual pricing.  All customers have access to the same fares."[25]

74.    The Federal Trade Commission ("FTC") has begun to define the mechanics of surveillance pricing:



75.     According to former FTC Commissioner Lina M. Khan, "Firms that harvest Americans' personal data can put people's privacy at risk.   Now firms could be exploiting this vast trove of personal information to charge people higher prices.   Americans deserve to know whether businesses are using detailed consumer data to deploy surveillance pricing."[26]

76.     Additionally, Congress is now taking action to address JetBlue's use of surveillance pricing, including a letter sent by United States Senator Ruben Gallego and House of Representatives member Greg Casar that called for responses to JetBlue's use of personal data for setting of fare prices.[27]   In part, the letter states about the social media post, "[w]hile JetBlue claimed in the wake of this post that fares are not 'determined' by cached data or personal information, this exchange raises questions about how JetBlue sets prices – specifically, how JetBlue is defining personal data and whether the personal data is used in any capacity to inform prices.   We are especially concerned that

---

[26] https://www.ftc.gov/news-events/news/press-releases/2024/07/ftc-issues-orders-eight-companies-seeking-information-surveillance-pricing, (last accessed Apr. 22, 2026).

[27] **Exhibit A**: Letter from Congress to JetBlue Airlines re Surveillance Pricing.

customers could be charged different prices for the same flight based on their need for travel, such as attending a funeral."[28]

77. JetBlue's conduct violates numerous laws, as well as basic notions of consumer privacy.

### *Jet Blue's Conduct Offends Basic Privacy Rights.*

78. JetBlue's services come with a reasonable expectation of privacy that exists because of the sensitive nature of the type of work that JetBlue does and the representations that JetBlue makes on its website. The same holds true for airline passengers who electronically walk into digital storefronts. These airline passengers deserve the same privacy rights afforded to ordinary consumers who walk up to a physical ticketing counter. This is especially true here, where Plaintiff and Class members did not anticipate, invite, or adequately consent to the presence of other third-party corporations looking over their digital shoulders as they transact business with JetBlue.

79. The identifying datapoints collected by JetBlue (device identifiers, internet protocol address(es), usernames and login information, etc.) in tandem with the information that Plaintiff accessed

---

[28] *Id.*

on Defendant's website to procure services, on their own, is highly sensitive information.

80. Rather than protect this information, as well as other potential data collected JetBlue allows it to be collected, retained and used by third parties that lack sufficient consent from Plaintiff and Class members to do so.

### The Value of Consumer Data

81. Plaintiff and Class members were harmed when JetBlue invaded their privacy rights by weaponizing their data for surveillance pricing through JetBlue's website. Reasonable airline passengers, who are consumers, would not have used JetBlue's website had they known that their privacy rights would be invaded as a result.

82. PII is extremely valuable. There is a huge market for the data collected on JetBlue's website. Plaintiff and Class members have suffered pecuniary losses when JetBlue sold and allowed for the resale of their data to unauthorized third parties because of the value of the data itself. The market for this data also has tangible value – including the use of the data to increase prices for airfare tickets.

37

### *Harm to Consumers*

83. Plaintiff and Class members provided their data to JetBlue to obtain information on the travel services that Defendant provides – services that happen to be highly personal and very private. This information was disclosed to and intercepted by third-parties, including FullStory, as listed herein through digital tracking technology. This information was collected and intercepted for business purposes, including to monitor consumer behavior and adjust airline pricing accordingly.

84. Plaintiff and the Class members did not adequately consent to the interception or disclosure of their data to these third parties, or to anyone else. As such, Plaintiff and the Class members have suffered from the type of privacy-centric harms that a patchwork of privacy protections that federal, state, and common law principles were intended to collectively protect against.

## CLASS ACTION ALLEGATIONS

85.    Plaintiff brings this Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(3), and (b)(4), individually and on behalf of the following Classes (collectively, the "Class"):

> **Nationwide Class:** All natural persons in the United States who used the JetBlue's website and/or mobile application and whose communications and/or data was shared with third parties during the applicable statutory period.

> **Virginia Sub-Class:** All natural persons in the Commonwealth of Virginia who used the JetBlue's website and/or mobile application and whose communications and/or data was shared with third parties during the applicable statutory period.

86.    Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

87.    *Numerosity*. The exact number of members of the Class is

39

unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands or even millions of individuals, and the members can be identified through JetBlue's records.

88.   ***Predominant Common Questions***.   The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

a. Whether JetBlue violated Plaintiff's and Class members' privacy rights;

b. Whether JetBlue violated the Electronic Communications Privacy Act;

c. Whether JetBlue's acts and practices violated state consumer protection laws;

d. Whether JetBlue's conduct is a breach of implied contract;

e. Whether JetBlue was unjustly enriched;

f. Whether Plaintiff and the Class are entitled to equitable relief, including but not limited to injunctive relief,

40

restitution, and disgorgement; and,

g. Whether Plaintiff and the Class are entitled to actual, statutory, punitive and/or other forms of damages, and other monetary relief.

89. *Typicality*.  Plaintiff's claims are typical of the claims of the other members of the Class and arise from the same conduct by Defendant and are based on the same legal theories.

90. *Adequate Representation*.  Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigation to remedy privacy violations.  Plaintiff has no interest that is antagonistic to the interests of the Class, and JetBlue has no defenses unique to any victim.  Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor their counsel have any interest adverse to the interests of the other members of the Class.

91. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and

efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

92. Plaintiff may revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## **FIRST CAUSE OF ACTION**

### **VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
### **18 U.S.C. § 2510 *et seq.***
(ON BEHALF OF THE NATIONWIDE CLASS)

93. Plaintiff re-alleges and incorporates all preceding paragraphs with the same force and effect as if fully restated herein.

94. The Electronic Communications Privacy Act ("ECPA") makes it illegal to intentionally intercept, or attempt to intercept, any wire, oral, or electronic communication and to disclose or use the contents of an unlawfully intercepted communication. 18 U.S.C. § 2511.

95.     ECPA provides a private right of action to any person whose electronic communications are intercepted. 18 U.S.C. § 2520(a).

96.     JetBlue intentionally intercepted electronic communications that Plaintiff and the Class members exchanged with Defendant through the tracking tools installed on its website.

97.     The transmission of data between Plaintiff and the Class members and JetBlue qualify as communications under ECPA. 18 U.S.C. § 2510(12).

98.     Defendant contemporaneously intercepted and transmitted Plaintiff's and the Class members' communications of that data to the companies whose trackers JetBlue installed or allowed to be installed on its website as well as for the purpose of engaging in third party tracking for behavioral analysis to modify ticket pricing.

99.     The trackers that JetBlue uses to track Plaintiff and the Class members' communications, Plaintiff and the Class members' browsers, Plaintiff and the Class members' computing devices, and the code that JetBlue placed or allowed to be placed on its website are all "devices" within the meaning of 18 U.S.C. § 2510(5).

100.    The third-party companies, including Dynamic Yield and

43

FullStory, that are the recipients of communications between Plaintiff and the Class members, on the one hand, and JetBlue, on the other, are not party to those communications.

101. Defendant transmits the contents of those communications through the surreptitious redirection of the communications from Plaintiff and the Class members' computing devices.

102. Plaintiff and the Class members did not consent to the third party companies' acquisition of their communications with JetBlue. Nor did the third-party companies receive adequate legal authorization to receive such communications.

103. In disclosing the content of Plaintiff's and the Class members' communications relating to the purchase and use of JetBlue's products, JetBlue had a purpose that was tortious, criminal, and designed to violate statutory provisions including:

    a. The unauthorized disclosure of individually identifiable information is tortious in and of itself, regardless of whether the means deployed to disclose the information violates the ECPA or any subsequent purpose or use. Defendant intentionally committed a tortious act by disclosing

individually personally identifiable information without authorization to do so;

b. Intrusion upon Plaintiff's and the Class members' seclusion;

c. Trespass upon Plaintiff's and the Class members' personal and private property; and

d. Violation of 18 U.S.C. §§ 1343 (fraud by wire, radio, or television) and 1349 (attempt and conspiracy) which prohibit a person from "devising or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate . . . commerce, any writing, signs, signals, pictures, or sounds for purpose of executing such scheme or artifice."

104. The federal wire fraud statute, 18 U.S.C. § 1343, has four elements: (1) that the defendant voluntarily and intentionally devised a scheme to defraud another out of money or property; (2) that the defendant did so with intent to defraud; (3) that it was reasonably foreseeable that interstate wire communications would be used; and (4)

45

that interstate wire communications were used. The attempt version of the statute provides that penalties apply to attempts as well as offenses. 18 U.S.C. § 1349.

105. JetBlue's scheme or artifice to defraud consists of the false and misleading statements in its privacy policy described herein.

106. JetBlue acted with intent to defraud in that it willfully invaded and took Plaintiff and the Class members' property, including the property rights to their individually personally identifiable information and their right to determine whether such information remains confidential; the right to determine who may collect and use such information for marketing; and the right to determine who has access to their devices and communications.

107. JetBlue also acted with intent to defraud in that it willfully invaded and took Plaintiff and the Class members' property (their PII) with knowledge that it lacked consent or authorization to do so; a reasonable consumer would not understand that JetBlue was collecting and transmitting their data to third parties; a reasonable consumer would be shocked to realize the extent of JetBlue's disclosure of data to third parties for the purpose of behavioral analytics and surveillance

46

pricing.

108. JetBlue acted with the intent to acquire, use, and disclose Plaintiff's and the Class members' PII without their authorization or consent.

109. Plaintiff and the Class members have suffered damages because of JetBlue's violations of ECPA, including that (1) JetBlue eroded the essential, confidential nature of the relationship between JetBlue and Class members, (2) JetBlue derived valuable benefits from using and sharing Plaintiff and the Class members' communications without their knowledge or informed consent and without providing compensation, (3) JetBlue's actions deprived Plaintiff and the Class members of the value of their PII, (4) JetBlue's actions diminished the value of Plaintiff's and the Class members' property rights in their PII; and (6) JetBlue violated Plaintiff and the Class members' privacy rights by sharing their PII for commercial use.

110. Plaintiff and the Class members seek appropriate declaratory or equitable relief including injunctive relief, actual damages and profits enjoyed by JetBlue due to the violations or the appropriate statutory measure of damages, punitive damages, and

47

reasonable attorneys' fees and costs. 18 U.S.C. § 2520. Pursuant to 18 U.S.C. § 2520, Plaintiff and the Class members seek monetary damages for the greater of (i) the sum of the actual damages suffered by the plaintiff and any profits made by JetBlue due to the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

111. Unless enjoined, JetBlue will continue to commit the violations of law described herein.

## SECOND CAUSE OF ACTION

### VIOLATIONS OF NEW YORK'S
### DECEPTIVE TRADE PRACTICES ACT
### N.Y. GEN. BUS. LAW §349
(ON BEHALF OF THE NATIONWIDE CLASS)

112. Plaintiff re-alleges and incorporates all preceding paragraphs with the same force and effect as if fully restated herein.

113. JetBlue is considered a "business" under New York General Business Law 349 ("GBL 349").

114. JetBlue's business acts and practices are unfair and deceptive under GBL 349. New York (as well as other states through their respective unfair and deceptive trade practices statutes) has a strong

public policy of protecting consumers' privacy interests, including protecting consumers' personal data. JetBlue violated GBL 349 by, among other things, disclosing and intercepting Plaintiff's and Class members' sensitive data, including private information, without consent.

115. JetBlue further engaged in unfair business practices because it made material misrepresentations and omissions concerning the information that it assured users it would not share with third parties in the manner that it did, which deceived and misled users of JetBlue's platform.

116. JetBlue's business acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of JetBlue secretly disclosing, intercepting, and misusing Plaintiff and Class members' sensitive and highly valuable personal data is significant, and there is no corresponding benefit resulting from such conduct.

117. Finally, because Plaintiff and Class members were completely unaware of JetBlue's conduct, they could not have possibly avoided the harm.

49

118. Indeed, although JetBlue's privacy policy states that JetBlue uses and shares personal information in certain circumstances, Plaintiff and the Class members cannot give informed consent for this type of collection given it was not included in the privacy policy.

119. By unlawfully disclosing and intercepting this data, JetBlue has taken money or property from Plaintiff and Class members.

120. Plaintiff and the Class Members seek all available damages under applicable state consumer protection laws, including statutory damages under GBL 349.

## THIRD CAUSE OF ACTION

### VIOLATIONS OF NEW YORK'S UNLAWFUL SELLING PRACTICES ACT N.Y. GEN. BUS. LAW §396
(ON BEHALF OF THE NATIONWIDE CLASS)

121. Plaintiff re-alleges and incorporates all preceding paragraphs with the same force and effect as if fully restated herein.

122. Under New York General Business Law §396 (GBL §396), unlawful selling practices are prohibited and can be enforced by private plaintiffs in civil litigation.

123. Specifically, GBL §396 prohibits the offering "for sale any merchandise, commodity, or service, as part of a plan or scheme with the

50

intent, design, or purpose not to sell the merchandise, commodity, or service so advertised at the price stated therein." GBL §396(1).

124. In this instance, JetBlue sells the same airline tickets for set prices – only to change those prices with the intent not to sell them if the consumer's personal data determines otherwise. For example, if the consumer, like Plaintiff Squire, exits the JetBlue's website, JetBlue then has the capacity to change prices and not sell them as advertised with the intent, design, or purpose to do so based on the personal information collected about Plaintiff Squire.

125. Under this provision, Plaintiff and Class members can pursue actual damages, $500 per violation, attorneys' fees, and any other relief this Court deems just and proper.

## **FOURTH CAUSE OF ACTION**

### **VIOLATIONS OF VIRGINIA WIRETAP AND EAVESDROPPING ACT, Va. Code § 19.2-61, *et seq.***
(ON BEHALF OF VIRGINIA SUBCLASS)

126. Plaintiff re-alleges and incorporates all preceding paragraphs with the same force and effect as if fully restated herein.

127. Virginia Code § 19.2-62(A)(3) prohibits the intentional disclosure "to any other person the contents of any wire, electronic or oral

51

communication knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication[.]"

128. JetBlue acted with intent to defraud in that it willfully invaded and disclosed to third parties Plaintiff and the Class members' PII, invading Plaintiff and Class members' right to determine whether such information remains confidential; the right to determine who may collect and use such information for marketing; and the right to determine who has access to their devices and communications.

129. JetBlue acted with intent in that it willfully invaded and disclosed to third parties Plaintiff and the Class members' PII with knowledge that it lacked consent or authorization to do so. A reasonable consumer would not understand that JetBlue was collecting and transmitting their data to third parties; a reasonable consumer would be shocked to realize the extent of JetBlue's disclosure of data to third parties for the purpose of behavioral analytics and surveillance pricing.

130. Under Virginia Code § 19.2-69 "any person whose wire, electronic, or oral communication is intercepted, disclosed or used in violation of this chapter … shall have a civil cause of action against any

52

person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use, such communications[.]" Under this provision Plaintiff and Class members can pursue actual damages (but no less than $400 per day or $4,000, whichever is higher, in liquidated damages), punitive damages, and reasonable attorney fees and litigation costs.

## FIFTH CAUSE OF ACTION

### VIOLATIONS OF VIRGINIA CONSUMER PROTECTION ACT, Va. Code § 59.1-196, *et seq.*
(ON BEHALF OF VIRGINIA SUBCLASS)

131. Plaintiff re-alleges and incorporates all preceding paragraphs with the same force and effect as if fully restated herein.

132. JetBlue is considered a "Supplier" under the Viriginia Consumer Protection Act, Va. Code § 59.1-196, *et seq.* ("VCPA")

133. JetBlue's business acts and practices are unfair and deceptive under VCPA. Virginia (as well as other states through their respective unfair and deceptive trade practices statutes) has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data. JetBlue violated VCPA by, among other things, disclosing and intercepting Plaintiff's and Class members'

sensitive data, including private information, without consent.

134. JetBlue further engaged in deceptive business practices because it made material misrepresentations and omissions concerning the information that it assured users it would not share with third parties in the manner that it did, which deceived and misled users of JetBlue's platform.

135. JetBlue's acts and practices are also deceptive in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of JetBlue secretly disclosing, intercepting, and misusing Plaintiff and Class members' sensitive and highly valuable personal data is significant, and there is no corresponding benefit resulting from such conduct.

136. Finally, because Plaintiff and Class members were completely unaware of JetBlue's conduct, they could not have possibly avoided the harm.

137. Indeed, although JetBlue's privacy policy states that JetBlue uses and shares personal information in certain circumstances, Plaintiff and the Class members cannot give informed consent for this type of collection given it was not included in the privacy policy.

54

138.   By unlawfully disclosing and intercepting this data, JetBlue has taken money or property from Plaintiff and Class members.

139.   Plaintiff and the Class Members seek all available damages under applicable state consumer protection laws, including statutory damages under VCPA.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and the proposed Class respectfully requests that the Court enter an order:

A. Certifying the Class and appointing Plaintiff as the Class representative;

B. Finding that JetBlue's conduct was unlawful, as alleged herein;

C. Awarding declaratory relief against JetBlue;

D. Awarding such injunctive and other equitable relief as the Court deems just and proper, including injunctive relief;

E. Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages;

F. Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

G. Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

H. Granting such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

140. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

DATED:    May 1, 2026

Respectfully Submitted,

*/s/ Todd S. Garber*
FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER LLP
1 North Broadway, Ste 900
White Plains, NY 10601
Tel: (914) 298-3283
tgarber@FBFGLaw.com

*Attorney for Plaintiff Squire*
*and the Proposed Classes*

56